UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES DORSEY and RODNEY SMITH,
On Behalf of Themselves and All Others
Similarly Situated,

                Plaintiffs,                    Civil Action No. 13-10412

            v.                        District Judge Julian Abele Cook, Jr.
                                            Magistrate Judge Laurie J. Michelson

TRUGREEN LIMITED PARTNERSHIP;
TRUGREEN, INC.; TRUGREEN
LAWNCARE; TRUGREEN OF
DELAWARE, INC.; and
SERVICEMASTER,

                Defendants.
_____/

**REPORT AND RECOMMENDATION TO
DENY DEFENDANTS' MOTION TO DISMISS, STRIKE COLLECTIVE
ACTION CLAIMS, AND COMPEL ARBITRATION [17]**

This is a proposed collective action charging violations of the Fair Labor Standards Act's minimum wage rate and overtime wage rate provisions. Defendants TruGreen Limited Partnership, TruGreen, Inc., TruGreen Lawncare, TruGreen of Delaware, Inc., and ServiceMaster Consumer Services Limited Partnership seek to compel the remaining named plaintiff, Rodney Smith,[1] to arbitrate on an individual basis. (Dkt. 17.) Defendants' Motion to Dismiss, Strike Collective Action Claims, and Compel Arbitration is before the Court for a report and recommendation. (Dkt. 24.) Smith, assertedly on behalf of himself and all others similarly situated, ("Plaintiff") opposes the motion. (Dkt. 21.) The Court held oral argument on

---

[1] Named plaintiff James Dorsey was dismissed by stipulated joint motion "so that he may pursue his claims in arbitration." (Dkt. 18.)

the motion on September 19, 2013, and has reviewed the briefs, including Defendants' Reply (Dkt. 25) and the supplemental authority submitted by Plaintiff (Dkt. 29). For the reasons that follow, the Court finds that Plaintiff's claims raise "pay rate issues" that he did not agree to arbitrate. The Court therefore RECOMMENDS that Defendants' Motion to Dismiss, Strike Collective Action Claims, and Compel Arbitration be DENIED.

# I. BACKGROUND

## A.  Allegations of the Complaint

Plaintiff was employed as a Sales Representative by at least one of the Defendants "[d]uring the relevant period," which is not specified in the Complaint. (Dkt. 1, Compl. ¶ 5; Dkt. 9, Ans. ¶ 5.) Plaintiff alleges that "Defendants represent themselves to the general public as one company—TruGreen—operating at multiple locations" and "share employees, have a common management, pool their resources, operate from the same headquarters, have common ownership, and have the same operating name." (Compl. ¶ 21.) Defendants deny this. (Ans. ¶ 21.)

Defendants' products and services include providing lawn, tree, and shrub care and maintenance services throughout the United States and Michigan. (Compl. ¶ 29; Ans.¶ 29.) Sales representatives such as Plaintiff contact potential customers and inform them of these services, among other responsibilities. (Compl. ¶ 32; Ans. ¶ 32.)

Plaintiff alleges that Defendants violated the Fair Labor Standards Act ("FLSA") by failing to pay overtime at the rates mandated by the FLSA. (Compl. ¶ 47.) Specifically, Plaintiff alleges that Defendants improperly implemented the "fluctuating workweek" ("FWW") method of pay. (Compl. ¶ 36.) The FWW method applies "[w]here there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours

worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period." 29 C.F.R. § 778.114(a). In this situation, "[p]ayment for overtime hours at one-half [the applicable hourly rate for the week] in addition to the salary satisfies the [time-and-one-half] overtime pay requirement because such hours have already been compensated at the straight time regular rate, under the salary arrangement." *Id.*

Plaintiff alleges that Defendants violated the requirements of the FWW method because he—and other potential members of a collective action class—received bonuses that varied from week to week and were not factored into their regular rate of pay, were subject to impermissible deductions from their pay, did not have a clear and mutual understanding that a fixed salary would compensate them for all hours worked each week, and received pay in some weeks that fell below the applicable minimum wage rate. (Compl. ¶¶ 40–46.) As a result, Plaintiff alleges, Defendants violated the FLSA because Plaintiff and others received pay at rates less than the time and one half their regular rates of pay for hours worked over forty hours per week. (Compl. ¶¶ 47–48.) Defendants admit that "certain employees were paid additional compensation, the amount of which did not remain constant from week to week" but otherwise deny these allegations and state that "all additional compensation was properly accounted for under the FLSA." (Ans. ¶¶ 40-48.)

Plaintiff alleges two counts against all Defendants: (1) failure to pay time-and-a-half for hours worked over forty per workweek in violation of 29 U.S.C. § 207; and (2) failure to pay the required minimum wage rate in violation of 29 U.S.C. § 206. (Compl. ¶¶ 65, 68.) Plaintiff seeks to recover, on behalf of himself and the proposed class members, unpaid minimum wage and

3

overtime compensation, plus an amount equal to all of their unpaid minimum wages and overtime compensation, as liquidated damages. (Compl. ¶ 73.) Plaintiff also seeks attorney's fees and expenses, and an order requiring Defendants to correct their pay practices going forward. (*Id.*)

### B.  The Arbitration Agreement

According to a declaration by Roy Cohen (Vice President, HR Business Partner for The ServiceMaster Company) submitted by Defendants in support of their motion, Plaintiff was employed by TruGreen Limited Partnership, a subsidiary of The ServiceMaster Company, "in various sales roles during the following time periods: May 14, 2007 to May 16, 2008; May 28, 2009 to October 31, 2009; and January 4, 2010 to October 15, 2010." (Dkt. 17-1, Cohen Decl. ¶¶ 1, 4, 5, 9.) Plaintiff signed "Compensation Plans" on June 1, 2009, January 11, 2010, and June 7, 2010, each of which stated that his participation in the Compensation Plan was "contingent on [his] agreement to utilize ServiceMaster's alternative dispute resolution program *We Listen* to resolve any and all work-related disputes/concerns and to arbitrate such disputes if they are not resolved." (Dkt. 17-4, Cohen Decl. Ex. C at Pg ID 213; *see also* Dkt. 17-5, Cohen Decl. Ex. D at Pg ID 216; Dkt. 17-6, Cohen Decl. Ex. E at Pg ID 221.) The Compensation Plans continued: "Full details regarding the *We Listen* program are available from your manager or HR representative and available online . . . ." (*Id.*)

According to Cohen, ServiceMaster has utilized the *We Listen* program since January 2009. (Cohen Dec. ¶ 6.)[2] Cohen states that ServiceMaster "has maintained a policy and practice

---

2 The parties do not address whether any part of Plaintiff's claim arose before the *We Listen* program was implemented. But Defendants assert in their Answer that Plaintiff's claims are

of providing all associates and new hires of its subsidiaries" with notice of the program, and that TruGreen Limited Partnership "generally gave all associates a copy of the *We Listen* Program Brochure at the time they were hired." (Cohen Dec. ¶¶ 7–8.)

The 2009 version of the *We Listen* Brochure, attached to Cohen's declaration, described the scope of the program as follows:

> *We Listen* is intended to address concerns or allegations related to discrimination or harassment on the basis of race, color, gender, religion, national origin, age, disability, veteran status, sexual orientation, protected leave status, or any other legally protected characteristic. These allegations or concerns may pertain to promotions, developmental opportunities, terminations, compensation, performance appraisals, and/or general treatment in the workplace. *We Listen* also addresses concerns related to retaliation, wrongful discharge, safety, and wage and hour issues.

(Dkt. 17-2, Cohen Decl. Ex. A at Pg ID 179, 185.) But the Brochure also stated:

> Unless they contain a discrimination component, the mediation and arbitration components of *We Listen* are not intended to address concerns or issues related to work assignments, hours of work, or salary grades, benefit policies or application of benefit plans, or the content of ServiceMaster policies. However, you should use the first three (internal) steps of *We Listen* to address such issues.

(Id. at Pg ID 185.) The Brochure further stated:

> This booklet is intended as a summary of the major features of the *We Listen* program. The *We Listen* Plan and Rules Document contains additional terms and conditions. In the event of any

---

limited by the applicable statute of limitations. (Ans., Defenses ¶ 6.) The FLSA provides that an action for unpaid minimum wages, unpaid overtime compensation, or liquidated damages under the Act is barred unless commenced within two years after the cause of action accrued, or within three years for a cause of action arising out of a willful violation. 29 U.S.C. § 255. This action was filed on February 1, 2013. (Dkt. 1.)

> variation between this booklet and the Plan and Rules Document,
> the Plan and Rules Document will control.

(*Id.* at Pg ID 180.)

Cohen avers that the *We Listen* Plan and Rules Document was made available to all associates of ServiceMaster subsidiaries on an internet site used by ServiceMaster to communicate company policies. (Cohen Decl. ¶ 7.) A copy of the Plan and Rules Document that was available on that internet site "prior to a January 1, 2012 revision of the *We Listen* program" is attached to Cohen's declaration. (*See id.* at ¶¶ 7–8.) It states that the *We Listen* plan "is intended to create an exclusive procedural mechanism for the final resolution of all Disputes falling within its terms." (Dkt. 17-3, Cohen Decl. Ex. B at Pg ID 197.) The definition of "Dispute" is broad:

> "Dispute" means, except as otherwise provided in this Plan, all legal and equitable claims, demands, and controversies, of whatever nature or kind, whether in contract, tort, under statute or regulation, or some other law . . . including, but not limited to, any matters with respect to . . . the employment or potential reemployment of an Associate, including the terms, conditions, or termination of such employment with the Company . . . .

(*Id.* at Pg ID 196–97.) But the definition carves out certain exemptions:

> For purposes of the mediation and arbitration components of the Plan, "Dispute **does not include concerns or issues related to**: (i) workers' compensation benefits; (ii) unemployment compensation benefits; (iii) injunctive relief relating to unfair competition, restrictive covenant (non-compete) and/or use of unauthorized disclosure of trade secrets or confidential information, as to which relief may be obtained from a court of competent jurisdiction; (iv) the interpretation or application of the Company's policies, practices, rules and procedures that result in disciplinary action consisting of a disciplinary notice, and/or

6

suspension, and/or discharge, unless such concern involves or relates to an allegation of unlawful harassment or discrimination; (v) changes to Company policies, performance evaluations, job descriptions, job classifications (grades), **pay rates**, changes to quality and quantity work standards, benefit plans covered by ERISA, disciplinary action that results from violation of the Company's substance abuse policy, unless such concern involves or relates to an allegation of unlawful harassment or discrimination, (vi) the Company's current (successor or future) stock option plans, employee benefits and/or welfare plans that contain an appeal procedure or other procedure for the resolution of disputes under the plan; (vii) a violation of the National Labor Relations Act.

(*Id.* at Pg ID 197 (emphasis added).)

According to the 2009 Brochure, the *We Listen* program encompassed five steps that were to be pursued sequentially: (1) raising the concern with an immediate supervisor, his or her boss, or a Human Resources manager; (2) calling a helpline for referral to a ServiceMaster ombudsperson, who could "help you by answering your questions, acting as a go-between, reviewing your options, getting the facts, helping you 'open doors,' referring you to other resources and helping you help yourself"; (3) review by "a rotating committee of up to five members of senior management"; (4) mediation before a neutral party provided by the American Arbitration Association ("AAA"), paid for by ServiceMaster ("[o]ther than the $50 filing fee and the cost of any legal counsel you might wish to retain"); and (5) arbitration through AAA, paid for by ServiceMaster. (*See* Cohen Decl. Ex. A at Pg ID 186–89.)

Defendants assert, in their Answer, that Plaintiff "failed to invoke the 'We Listen' process prior to filing the instant lawsuit" and "failed to exhaust all mandatory prerequisite requirements of the We Listen Program—including but not limited to invoking mediation as set

7

forth in Step Four of the We Listen Rules—prior to filing their Complaint." (Ans., Defenses ¶ 1–2.) Plaintiff apparently does not dispute this, instead arguing that "the agreement, by its express terms, excludes the claims at issue in this case." (Dkt. 21, Resp. to Mot. at 2.)

## II. ANALYSIS

### A.  Legal Standard

The Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.*, provides that a written provision in a contract "to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This section of the FAA "embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts." *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972 (6th Cir. 2007) (internal citation and quotation omitted). When presented with an issue that is referable to arbitration pursuant to a valid arbitration agreement, the court, upon the application of either party, must stay the suit and compel arbitration. 9 U.S.C. § 3.

Arbitration under the FAA is "a matter of consent, not coercion." *Albert M. Higley, Co. v. N/S Corp.*, 445 F.3d 861, 863 (6th Cir. 2006) (quoting *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)). A party "cannot be required to submit to arbitration a dispute which it has not agreed to submit to arbitration." *NCR Corp. v. Korala Assocs., Ltd.*, 512 F.3d 807, 813 (6th Cir. 2008) (quoting *Simon v. Pfizer Inc.*, 398 F.3d 765, 775 (6th Cir. 2005)). Thus, a court should not "override the clear intent of the parties, or

8

reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002).

Nonetheless, in determining the scope of an agreement to arbitrate, "any doubts . . . should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983). "An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582–83 (1960).

### B.  The Scope of the Arbitration Agreement

To summarize the issue currently before the Court: Defendants argue that Plaintiff's claims raise "wage and hour" issues, which the Brochure says are arbitrable, while Plaintiff argues that his claims raise issues related to "pay rates," which the Plan excludes from the arbitration agreement.

At the outset, the Court dispenses with Plaintiff's argument that the Brochure is extrinsic evidence. That argument is not supported by the evidence before the Court. The Compensation Plans that Plaintiff signed made participation contingent on his agreement to utilize the *We Listen* program, for which "full details . . . are available from your manager or HR representative and available online . . . ." (Cohen Decl. Ex. D at Pg ID 216; Cohen Decl. Ex. C at Pg ID 213.)[3]

---

3 The 2009 Compensation Plan stated that "full details" were available "online at: http://www.eyeonservicemaster.com/news/We_Listen." (Cohen Decl. Ex. D at Pg ID 216.) The 2010 Compensation Plan contained identical language, except that the web address given was "http://www.symfastforward.com/assets/files/WeListen_online.pdf." (Cohen Decl. Ex. C at Pg ID 213.)

According to the declaration submitted by Defendants, the Brochure "was made available to associates as a handout," and the Plan and Brochure were both available on an internal web site or web sites for communications to employees. (Cohen Decl. ¶ 7.)[4] Most significantly, the Brochure stated that it was "a summary of the major features of the We Listen program" and that the Plan "contains *additional* terms and conditions." (Cohen Decl. Ex. A at Pg ID 224 (emphasis added).) Moreover, neither document contained an integration clause or otherwise purported to be the parties' "entire agreement." A "prerequisite to the application of the parol evidence rule[ ] [is that] there must be a finding that the parties intended the written instrument to be a complete expression of their agreement as to the matters covered." *United Precision Products Co., Inc. v. Avco Corp.*, No. 10-2191, 2013 WL 5383449, at *4 (6th Cir. Sept. 26, 2013) (unpublished) (quoting *NAG Enters., Inc. v. All State Indus., Inc.*, 285 N.W.2d 770, 771 (Mich. 1979)).[5] The agreement between the parties is therefore contained in both the Brochure and Plan.

----

4 Cohen avers that the Brochure was "on-line at the ServiceMaster intra-net site, along with other policies and procedures and company communications," and the Plan was "on an internet site found at http://www.eyeonservicemaster.com/news/We-Listen (or the predecessor to that internet site—svmfastforward.com)," which was "utilized by ServiceMaster to communicate all company policies, procedures, benefits and other important communications, and [wa]s accessible by anyone who ha[d] an email address and an employee ID code for one of ServiceMaster's subsidiaries (including TruGreen [Limited Partnership])." Cohen Decl. ¶ 7.

5 Although the FAA preempts state laws and policies regarding arbitration, state contract law governs in determining the validity of the arbitration agreement, provided the contract law applied is general and not specific to arbitration. *Fazio v. Lehman Bros.*, 340 F.3d 386, 393 (6th Cir. 2003). The Brochure and Plan do not specify applicable law other than the FAA, but both parties cite Michigan contract law. (*See* Cohen Decl. Ex. B at Pg ID 199, 209; Mot. at 7; Resp. to Mot. at 6.)

10

The Plan provided that the parties agreed to arbitrate a very broad scope of issues, including "all legal and equitable claims, demands, and controversies, of whatever nature or kind, whether in contract, tort, under statute or regulation, or some other law . . . ." (Mot. Ex. B at Pg ID 196.) The Brochure made clear that this included "wage and hour issues." (Mot. Ex. E at Pg ID 179, 185.) The Plan also provided, however, that certain issues were carved out of this broad scope, including "issues related to . . . pay rates . . . unless such concern involves or relates to an allegation of unlawful harassment or discrimination." (Mot. Ex. B at Pg ID 197.) If "wage and hour issues" is read too broadly, the exception for "pay rate issues" becomes meaningless. Likewise if "pay rate issues" is read too broadly, "wage and hour issues" becomes meaningless. Under Michigan law, "[c]ontracts must be construed as a whole: if reasonably possible, all parts and every word should be considered; no part should be eliminated or stricken by another part unless absolutely necessary." *Workmon v. Publishers Clearing House*, 118 F.3d 457, 459 (6th Cir. 1997) (citing *Associated Truck Lines, Inc. v. Baer*, 77 N.W. 2d 384 (Mich. 1956)).

Neither the Brochure nor the Plan contains a definition of "pay rate" or "wage and hour." Both parties define "pay rate" as "amount of money received per unit of time." (Mot. at 10; Resp. at 7.) Neither party expressly suggests a definition of "wage and hour," but Defendants seem to argue that it should be understood to mean "any of the variety of issues regulated by the United States Department of Labor's 'Wage and Hour Division'—the agency charged with oversight and law enforcement of the entire 'wage and hour' field." (Mot. at 9.)

Defendants distinguish "pay rate issues" from "wage and hour issues" by reading the "pay rate" exclusion "to mean that the Program does not cover an employee's dissatisfaction

11

with his or her rate of pay that does not implicate any wage and hour laws—for instance, the employee who simply thinks he should be paid $20 per hour instead of $19." (Mot. at 10–11.) Plaintiff distinguishes the two phrases by arguing that only wage and hour issues related to discrimination are to be arbitrated, relying on a sentence of the Brochure that states: "concerns or issues related to work assignments, hours of work or salary grade, benefit policies or application of benefit plans or the content of Service Master policies" are not subject to arbitration unless they "contain a discrimination component." (*Id.* at 8.)[6]

The Court does not find Plaintiff's view persuasive. The Brochure provides on the very first page that the *We Listen* program addresses concerns related to wage and hour issues, without any limitation regarding discrimination. (Mot. Ex. E at Pg ID 179.) The statement about wage and hour issues is repeated several pages later, this time followed by a separate paragraph that states: "Unless they contain a discrimination component, the mediation and arbitration components of *We Listen* are not intended to address concerns or issues related to work assignments, hours of work, or salary grades, benefit policies or application of benefit plans, or the content of ServiceMaster policies." (Mot. Ex. E at Pg ID 185.) This paragraph is the sole

---

6 In another FLSA overtime claim against TruGreen, a federal court in Texas appeared to take this view when it commented that "review of the 2009 plan documents support the conclusion that compensation and wage-and-hour issues were only subject to mandatory arbitration if they 'contain[ed] a discrimination component.'" *Johnson et al. v. TruGreen Ltd. P'Ship et al.*, No. 12-166, 2012 U.S. Dist. LEXIS 188280, at *16–17 (W.D. Tex. Oct. 25, 2012). But that court found that the named plaintiffs had agreed to a 2012 revision of the *We Listen* program that expressly required arbitration of claims related to the FLSA. *Id.* at *17. The court later stated that it had "not yet made a final ruling as to whether the 2009 program covers the claims asserted in this lawsuit." *Johnson et al. v. TruGreen Ltd. P'Ship et al.*, No. 12-166, Order on Motion to Alter Judgment, at 11 (W.D. Tex. May 21, 2013).

12

basis of Plaintiff's argument. It is not a plausible reading. This limitation, by its terms, does not apply to "wage and hour issues"; that phrase is not included in the list of issues that must contain a discrimination component. Moreover, the "discrimination component" limitation is conspicuously absent from the first page of the Brochure, where the "wage and hour issues" language first appears.

On the other hand, Defendants' argument that any claim that implicates a wage and hour statute cannot be a pay rate issue would narrow the scope of "pay rate issues" beyond the plain and ordinary meaning of the phrase. *Cf. Coates v. Bastian Bros., Inc.*, 741 N.W. 2d 539, 543 (Mich. 2007) ("This Court examines contractual language and gives the words their plain and ordinary meanings."). Instead, the Court finds that non-arbitrable pay rate issues are those that implicate "amount of money received per unit of time," while arbitrable wage and hour issues are those that concern labor and employment laws. The Court turns to the Complaint to determine how Plaintiff's claims fit with these categories.

Plaintiff's allegations focus on the overtime provisions of the Fair Labor Standards Act. The Act requires that if an employee is to work longer than forty hours per workweek, an employer must compensate the employee "at a rate of not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a). Employers who violate the FLSA's overtime provisions by failing to appropriately compensate employees may be liable for payment of both unpaid overtime wages and an equivalent amount of liquidated damages. 29 U.S.C. § 213(b).

13

But in *Overnight Motor Transportation Co. v. Missel*, the Supreme Court authorized an alternate method for calculating overtime compensation that may be used where an "employment contract is for a weekly wage with variable or fluctuating hours." 316 U.S. 572, 580 (1942). "*Missel*'s method . . . has since been incorporated into an interpretive rule promulgated by the Department of Labor" as 29 C.F.R. § 778.114. *Urnikis-Negro v. Am. Family Prop. Servs.*, 616 F.3d 665, 675 (7th Cir. 2010); *see also Highlander v. K.F.C. Nat. Mgmt. Co.*, 805 F.2d 644, 647 (6th Cir. 1986) ("[T]he fluctuating work week method of overtime payment [is] authorized under 29 C.F.R. § 778.114."). Under the fluctuating workweek method, as the rule is known, the weekly salary is divided by the number of hours worked in a particular workweek—including hours worked over forty, if any—to calculate the "regular rate." 29 C.F.R. § 778.114(a). An additional payment for any hours worked over 40 is then made at one-half this regular rate "because such hours have already been compensated at the straight time regular rate, under the salary arrangement." *Id.* Use of the FWW method does not result in paying half-time for overtime hours; rather, it permits an employer to apply the weekly salary to the overtime hours as part of the time-and-a-half overtime rate.

Before an employer may apply FWW, four conditions must be satisfied: (1) the employee's hours fluctuate from week to week; (2) the employee receives a "fixed weekly salary" that does not vary based on the number of hours worked during the week; (3) the fixed salary provides compensation at a regular rate that is not lower than minimum wage; and (4) there is a "clear mutual understanding" among the parties that the fixed salary is compensation

14

(apart from overtime premiums) for all hours worked each workweek, whatever their number. 29 C.F.R. § 778.114(a), (c).

In the Complaint, Plaintiff alleges that he and others like him did not receive "fixed salaries" each week because Defendants paid them bonuses in addition to their regular salary, and the bonuses varied from week to week. (Compl. ¶¶ 40–42.) In addition, Plaintiff alleges, those bonuses were not factored into their "regular rate" of pay. (Compl. ¶ 43.) Plaintiff also disputes whether there was a "clear mutual understanding" regarding his and others' salaries. (Compl. ¶ 46.) He further alleges that there were weeks when their pay fell below the applicable minimum wage rate (*id.*), and that Defendants made deductions from their pay that were "impermissible under the FWW method" (*id.* at ¶ 45). Thus, whether because FWW did not apply or because it was misapplied, Plaintiff claims that TruGreen did not pay him and others adequate overtime compensation. Or, as Plaintiff frames the issue, he and others like him were "denied overtime at the rates mandated under the FLSA." (Compl. at ¶ 47.)

To understand the substance and nature of Plaintiff's claims, the Court surveyed similar FLSA overtime claims that have been litigated. For example, the plaintiffs in *Soderberg v. Naturescape, Inc.*, like Plaintiff here, were employees of a lawn care service provider and claimed their employer improperly calculated their overtime wages under FWW because of certain production and year-end bonuses that they received. No. 10-3429, 2011 U.S. Dist. LEXIS 156235, at *2 (D. Minn. Nov. 3, 2011). On cross-motions for summary judgment, the *Soderberg* court first determined that Naturescape "was eligible to apply the FWW," *id.* at *19, because "the statutory permission to include performance-based bonuses in the regular rate of pay does

15

not run afoul of the FWW," *id.* at *15, and because "[c]ourts have recognized that § 778.114 does not require that the parties' 'clear and mutual understanding' extend to precisely how overtime premiums would be calculated," *id.* at *17. Second, the court asked "whether Naturescape's failure to include bonus payments in the regular rate of pay subjects it to FLSA liability." *Id.* at *19. The court found Naturescape liable under the FLSA because "[t]he applicable regulation mandates the inclusion of non-discretionary bonus payments in the determination of the regular rate of pay and, by extension, overtime pay." *Id.* at *20.

Other cases addressing FWW and overtime characterize the issues similarly. *See, e.g.*, *Aiken v. Cnty. of Hampton*, 172 F.3d 43, 1998 WL 957458, at *2 (4th Cir. 1998) (unpublished) ("The crux of Aiken's argument is that Hampton County did not comply with the requirements of 29 C.F.R. § 778.114 ('section 114') and thus could not use the 'fluctuating workweek' system to calculate and pay overtime compensation."); *Sisson v. Radioshack Corp.*, No. 12-958, 2013 WL 945372, at *2 (N.D. Ohio Mar. 11, 2013) ("This case presents a straightforward legal question. May a company utilize the FWW method to calculate overtime pay rates while also paying employees non-discretionary quarterly and year end bonuses? To answer this question, the Court must first examine the FWW in light of the FLSA."); *Cash v. Conn Appliances*, 2 F. Supp. 2d 884, 896 (E.D. Tex. 1997) ("Liability arises if the employer either miscomputes overtime pay or uses the fluctuating workweek method despite the absence of one or more of the criteria for doing so."); *Brumley v. Camin Cargo Control, Inc.*, Civ. No. 08-1798, 2010 U.S. Dist. LEXIS 144198, 2010 WL 1644066, at *3 (D.N.J. Apr. 22, 2010) (analyzing "the applicability of the FWW" and granting summary judgment to plaintiffs "on the issue of whether

16

Defendant's policies and practices violated the FLSA due to the absence of the fixed salary requirement").

On the surface, it seems clear that Plaintiff's claims raise issues "related to pay rates" that are excluded from arbitration, according to the Plan. But it is equally true that these claims, which implicate the FLSA statutory scheme for FWW, involve "wage and hour" issues that the Plaintiff agreed to arbitrate, according to the Brochure. Plaintiff's claims fit into both categories. This is exactly the type of conflict contemplated by the Brochure when it stated that "[i]n the event of any variation between this booklet and the Plan and Rules Document, the Plan and Rules Document will control." (Cohen Decl. Ex. A at Pg ID 180.) The Plan exempts these claims from arbitration, but the Brochure says they are within the scope of the arbitration plan. The two documents vary, as applied in this context. Giving priority to the Plan then, according to the Brochure's instruction, the Court must find that Plaintiff's claims are excluded from arbitration as "pay rate" issues.

A federal court in Pennsylvania recently analyzed TruGreen's *We Listen* Program in the context of virtually identical FLSA overtime claims and reached the same result. *Sylanski v. TruGreen Limited Partnership*, No. 11-1760, 2012 U.S. Dist. LEXIS 186303 (E.D. Pa. June 13, 2012); *see also Kelkis v. TrueGreen Ltd. P'hip*, 2013 Phila. Ct. Com. Pl. LEXIS 206 (Phila. Cty., Penn., Ct. Comm. Pl. June 19, 2013) (following *Sylanski*). In *Sylanski v. TruGreen*, the court found these overtime calculation issues to be a pay rate dispute, and refused to compel arbitration. *Sylanski*, 2012 U.S. Dist. LEXIS 186303, at *11. District Judge Petrese B. Tucker apparently concluded that the Brochure and the Plan varied, and therefore the Plan controlled.

17

She wrote: "were the Court interpreting the scope of the arbitration agreement based upon the We Listen Brochure alone, the Court would have to conclude that his dispute is arbitrable." *Id.* at *10. But because the Brochure provided that "[i]n the event of any variation between this booklet and the Plan and Rules Document, the Plan and Rules Document will control," Judge Tucker looked to the Plan to determine whether the plaintiffs' claims should be arbitrated. *Id.* ("In light of this language, the Court considers the language of the Plan and Rules regarding 'pay rates.'").

Defendants argue that this Court should instead follow the lead of another court in this district that analyzed similar language in an arbitration agreement. In *Eichinger v. Kelsey-Hayes Co.*, No. 09-14092, 2010 U.S. Dist. LEXIS 68148 (E.D. Mich. July 8, 2010), District Judge Victoria A. Roberts found that the parties' arbitration agreement applied to the plaintiff's FLSA overtime claim although the agreement contained an exemption for "disputes over . . . . Company wage rates or salary structures." *Id.* at *8. The court reasoned:

> Contrary to Eichinger's belief, her claim for overtime pay does not constitute a dispute over her wage rate or salary structure. Eichinger is not challenging the rate at which Kelsey-Hayes pays for overtime work, nor does she allege that she should have been paid a higher base wage, or placed in a higher salary grade.

*Id. Eichinger* was primarily an age discrimination case; the court found that "Eichinger's claims fall within the scope of the Problem Resolution Policy; they are claims of discrimination and retaliation based on protected status, and other employment-related claims provided for by federal law." *Id.* The complaint alleged that the defendants violated the FLSA by "requiring [Eichinger] to work in excess of forty hours a week but not paying [her] one and one-half times

18

the regular rate at which she was employed by [d]efendants for the excess hours worked by [Eichinger]." *Eichinger v. Kelsey-Hayes Co.*, No. 09-14092, Complaint ¶ 27 (E.D. Mich. Oct. 16, 2009). Plaintiff here argues that Eichinger was challenging her classification as an exempt employee, meaning she was not paid any overtime at all, so the case is distinct because she was not challenging how her overtime pay was calculated. (Resp. at 9.) While the precise nature of Eichinger's FLSA claim is not clear from the complaint or Judge Roberts' opinion, it does not appear that Eichinger alleged that her overtime rate was incorrectly calculated, as Plaintiff alleges here. Thus, *Eichinger* does not compel this Court to a different conclusion.

The Court is very conscious that the Supreme Court has instructed that where an arbitration agreement is "susceptible of an interpretation that covers the asserted dispute," arbitration should be compelled. But in this case, the agreement has foreclosed any susceptibility to another interpretation. The drafters of the agreement (apparently Defendants) anticipated this situation. The Brochure instructs that where two interpretations are possible—one on the basis of the Brochure and the other on the basis of the Plan—the Plan controls. Accordingly, the Court cannot recommend compelling Plaintiff to arbitrate his claims.

### C. Collective Action Claims

Defendants also move to strike Plaintiff's collective action claims, arguing that the arbitration agreement does not authorize class arbitration. (Mot. at 14–17.) Because the Court finds that Plaintiff's claims are outside the scope of the arbitration agreement, there is no basis on which to strike the collective action claims. The Court therefore recommends denial of the Motion to Strike.

19

## III. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds that Plaintiff's claims raise "pay rate issues" that he did not agree to arbitrate. The Court therefore RECOMMENDS that Defendants' Motion to Dismiss, Strike Collective Action Claims, and Compel Arbitration be DENIED.

## IV. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier*, 454 F.3d at 596–97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
UNITED STATES MAGISTRATE JUDGE

Dated: October 16, 2013

20

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on October 16, 2013.


s/Jane Johnson
Deputy Clerk

21